# EXHIBIT F

1    The opinion in support of the decision being entered today was *not* written
2    for publication and is *not* binding precedent of the Board.
3
4
5
6
7
8    UNITED STATES PATENT AND TRADEMARK OFFICE
9    _____
10
11    BEFORE THE BOARD OF PATENT APPEALS
12    AND INTERFERENCES
13    _____
14
15    *Ex parte* Peng Tan[1]
16    _____
17
18    Appeal 2006-3235
19    Reexamination Control 90/006,696
20    Patent 4,682,857[2]
21    Technology Center 2800
22
23    _____
24    Decided: March 28, 2007
25    _____
26
27
28    Before JOHN C. MARTIN, LEE E. BARRETT, and JAMESON LEE,
29    *Administrative Patent Judges*.
30
31
32
33

MAILED

MAR 2 8 2007

U.S. PATENT AND TRADEMARK OFFICE
BOARD OF PATENT APPEALS
AND INTERFERENCES

---

[1]  The appellant is the patent owner, inventor Peng Tan.  This reexamination proceeding was initiated at the request of a third-party requester, Philips Intellectual Property & Standards ("Requester").  *See* Request for Reexamination Transmittal Form, dated July 7, 2003.
[2]  Based on Application 06/718,866, filed April 2, 1985.

ISSI 00140

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    MARTIN, *Administrative Patent Judge.*

2                            DECISION ON APPEAL

3           This is an appeal under 35 U.S.C. §§ 134(b) and 306 from the final

4    rejection of Claim 11[3] under 35 U.S.C. § 102(b) for anticipation by Aszodi.[4]

5    We have jurisdiction under 35 U.S.C. §§ 134(b) and 306.

6           Although the patent under reexamination expired on July 28, 2004,

7    which was during the course of this reexamination proceeding, we retain

8    jurisdiction because a patent may be reexamined until the end of its period of

9    enforceability,[5] which runs until six years after its expiration date. *See*

10   35 U.S.C. § 286.[6]

11          We affirm.

12                *I. STATUS OF RELATED LITIGATION*

13          The patent being reexamined (hereinafter "the '857 patent") was the

14   basis for an infringement action styled *Peng Tan v. Advanced Micro*

15   *Devices, Inc.*, C99-05228 MMC (N.D. Cal.). *See* Third Party Requestor's

16   Statement In Support of the Request for Ex Parte Reexamination Under

17   37 C.F.R. § 1.510 (hereinafter "Reexamination Request"), dated July 7,

---

[3] Claims 1-10 stand allowed.

[4] G. Aszodi, J. Szabon, I. Janossy, and V. Szekely, *High Resolution Thermal Mapping of Microcircuits Using Nematic Liquid Crystals*, 24 Solid-State Electronics 1127-33 (1981). Br. Ex. C.

[5] *See* 37 C.F.R. § 1.510(a) (2006) ("Any person may, at any time during the period of enforceability of a patent, file a request for *ex parte* reexamination by the Office of any claim of the patent on the basis of prior art patents or printed publications cited under § 1.501.").

[6] 35 U.S.C. § 286 (2000) provides in pertinent part: "Except as otherwise provided by law, no recovery shall be had for any infringement committed more than six years prior to the filing of the complaint or counterclaim for infringement in the action."

2

ISSI 00141

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    2003, at 5-6.[7] During the oral argument in this reexamination proceeding,

2    Appellant's counsel explained that that action has been dismissed.

3         During that litigation, Advanced Micro Devices, Inc. moved for

4    summary judgment against Claim 11 for invalidity under 35 U.S.C. § 101

5    and § 112, second paragraph. Reexam. Request 5-6 & Exhibits 7-10. The

6    court denied the motion in an order entered April 24, 2000, on the ground

7    that "the issue presented is inextricably linked to the Court's construction of

8    Claim 11 and that it is inappropriate to construe the claim based on the

9    record presented in connection with the instant motion." Order Denying

10   Defendant's Motion for Summary Adjudication of Invalidity of Claim 11.[8]

11        The question of whether Claim 11 complies with 35 U.S.C. §§ 101

12   and 112 has not been raised and could not properly have been raised for

13   consideration during this reexamination proceeding. Patentability

14   challenges to Claim 11 are limited to unpatentability over prior patents and

15   publication because no subject matter has been added to or deleted from the

16   patent during this reexamination proceeding. 37 C.F.R. § 1.552 (2006).[9]

---

[7] The Reexamination Request was accompanied by a "Declaration Under 37 C.F.R. § 1.131" by David L. Burgess (Attachment 1), a list of exhibits (Attachment 2), the exhibits themselves (Attachment 3) (hereinafter "Reexam. Ex. __"), and a PTO-1449 form (Attachment 4) listing the exhibits of Attachment 3 and other documents. Some of the Reexamination Exhibits are also exhibits to the Brief.

[8] This order is before us as the last two pages of the exhibits (Attachment 3) to the Reexamination Request. These two pages follow Exhibit 10 but are not marked as Exhibit 11. Although the list of exhibits (Attachment 2) includes an Exhibit 11 identified as U.S. Patent 3,934,199 to Channin, apparently no such exhibit was provided.

[9] § 1.552. Scope of reexamination in *ex parte* reexamination proceedings.

ISSI 00142

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   We presume for purposes of this appeal that Claim 11 satisfies the

2 requirements of 35 U.S.C. §§ 101 and 112.

3   *II. APPELLANT'S INVENTION*

4   Appellant invented a method of using a nematic liquid crystal to

5 detect a "hot spot" in an integrated circuit device. The various steps of the

6 method are recited in detail in allowed independent Claim 1, on which

7 allowed Claims 2-10 depend. Broadly speaking, these steps include

8 applying a thin film of a liquid crystal to the surface of an integrated circuit

9 die or wafer, illuminating the liquid crystal with polarized light, delivering a

10 current to the integrated circuitry on the die or wafer, using a heating system

11 to vary the temperature liquid crystal in the specific manner recited in the

12 claim, and detecting changes in the polarization angle that indicate that the

13 phase transition temperature of the liquid crystal has been exceeded in the

14 corresponding portion of the die or wafer. Dependent claim 9 specifies that

15 the liquid crystal comprises a nematic liquid crystal, or a cholesteric liquid

16 crystal, or a smectic liquid crystal. Claim 10, dependent on claim 9,

17 specifies that the liquid crystal is 4 "CYANO-4'HEXYL-BIPHENYL,

18 [whose] trade name is K-18 nematic liquid crystal."

---

  (a) Claims in an *ex parte* reexamination proceeding will be examined on the basis of patents or printed publications and, with respect to subject matter added or deleted in the reexamination proceeding, on the basis of the requirements of 35 U.S.C. 112.
  (b) Claims in an *ex parte* reexamination proceeding will not be permitted to enlarge the scope of the claims of the patent.
  (c) Issues other than those indicated in paragraphs (a) and (b) of this section will not be resolved in a reexamination proceeding. . . .

ISSI 00143

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    Claim 11, which is the subject of this appeal, reads:

2          11. A new use of liquid crystal for detecting hot
3    spot on die or wafer with a hot spot detection method,
4    said liquid crystal comprises:
5          4 CYANO-4'HEXYL-BIPHENYL, trade name is
6    K-18 nematic liquid crystal[;] or
7          4 CYANO-4'PENTYL-BIPHENYL, trade name is
8    K-15 nematic liquid crystal; or
9          4 CYANO-4'HEPTYL-BIPHENYL, trade name is
10   K-21 nematic liquid crystal; or
11         4 CYANO-4'OCTYL-BIPHENYL, trade name is
12   K-24 nematic liquid crystal; or
13         4 CYANO-4'NONYL-BIPHENYL, trade name is
14   K-27 nematic liquid crystal; or
15         4 CYANO-4'DECYL-BIPHENYL, trade name is
16   K-30 nematic liquid crystal; or
17         4 CYANO-4'UNDERDECYL-BIPHENYL, trade
18   name is K-33 nematic liquid crystal; or
19         4 CYANO-4'DODECYL-BIPHENYL, trade name
20   is K-36 nematic liquid crystal.
21

22   *III. SUMMARY OF THIS REEXAMINATION PROCEEDING TO DATE*

23   The Requester asserted that Claim 11 is anticipated by each of Aszodi,

24   Stephens,[10] and Burgess/Tan,[11] Reexam. Request 7-14, and also

25   unpatentable for obviousness over those and other references. *Id.* at 14-24.

---

[10] C.E. Stephens and F.N. Sinnadurai, *A Surface Temperature Limit Detector Using Nematic Liquid Crystals with an Application to Microcircuits*, 7 Journal of Physics E: Scientific Instruments 641-43 (1974). Br. Ex. J; Reexam. Ex. 6.

[11] David L. Burgess and Peng Tan, *Improved Sensitivity for Hot Spot Detection Using Liquid Crystals*, 22nd Annual Proceedings of I.E.E.E. Reliability Physics Symposium, 1984, pp. 119-21. Br. Ex. E.

5

ISSI 00144

Appeal 2006-3235
Reexamination Control No. 90/006,696

1      On September 23, 2003, the Examiner ordered reexamination of

2  Claims 1-11.  Order Granting/Denying Request for Ex Parte Reexamination

3  (Paper No. 6).

4      In an Office action ("First Action") dated June 3, 2004,[12] the

5  Examiner indicated that claims 1-10 are allowable and rejected Claim 11 for

6  (1) anticipation by Aszodi under 35 U.S.C. § 102(b) and (2) anticipation by

7  Burgess/Tan under 35 U.S.C. § 102(a).

8      Seven weeks later, on July 28, 2004, the '857 patent, which issued on

9  July 28, 1987, with a seventeen-year term, expired.

10      On September 1, 2004, Appellant responded to the First Action by

11  submitting a "Declaration of the Patentee Under 37 C.F.R. § 1.132" (Paper

12  No. 11) and supporting declarations by Richard Yeager Moss II and Frank

13  Jung[13] purporting to establish sole inventorship by Appellant of the subject

14  matter the Examiner relied on in Burgess/Tan and thereby remove it as prior

15  art.

16      In a December 21, 2004, final Office action ("Final Action"[14]), the

17  Examiner (at 8-9) withdrew the rejection based on Burgess/Tan in light of

18  the § 1.132 showing and repeated the rejection for anticipation by Aszodi.

19      Appellant responded on February 28, 2005, by filing declarations

20  under 37 C.F.R. § 1.132 by Kin Ping Lim (Br. Ex. F) and Frank Jung

21  (Br. Ex. G) challenging the Examiner's interpretation of Claim 11 and his

22  conclusion of anticipation by Aszodi.  These declarations were accompanied

---

[12] Paper No. 7; Br. Ex. A.
[13] Exhibits A and B to Appellant's § 1.132 declaration.
[14] Paper No. 16; Br. Ex. B.

6

ISSI 00145

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    by a paper entitled "Showing of Good and Sufficient Reasons Why the

2    Declaration Under 37 C.F.R. § 1.132 Is Necessary and Was Not Earlier

3    Presented."

4          The Appeal Brief was filed on April 22, 2005.

5          In an advisory Office action (Paper No. 24) mailed on April 27, 2005,

6    the Examiner explained that he had considered the Lim and Jung

7    declarations but would maintain the rejection.

8          A first Examiner's Answer was mailed on August 2, 2005, and a

9    Reply Brief was received on October 6, 2005.  Following a February 13,

10    2006, remand by the Board for clarification of certain matters, the Examiner

11    mailed a revised Examiner's Answer on April 20, 2006 (hereinafter

12    "Answer").[15]  On May 5, 2006, Appellant filed a Supplemental Reply Brief

13    directed to the revisions in the Answer.  The Reply Brief and the

14    Supplemental Reply Brief were entered and considered by the Examiner.[16]

15          The appeal was orally argued on January 9, 2007.

16                    *VI. ISSUES*

17          The only question before us is whether Appellant has established that

18    the Examiner erred in rejecting Claim 11 as anticipated by Aszodi.

19    Resolution of this question requires consideration of the following issues:

20          1.  What effect, if any, does the expiration of the '857 patent have on

21    the construction of Claim 11?

22          2.  Is Appellant correct to assert that the relevant field of endeavor is

23    limited to failure analysis?

---

[15]  Of the two Examiner's Answers, we have limited our consideration
to the revised version.

[16]  *See* Papers mailed November 18, 2005, and June 7, 2006.

7

ISSI 00146

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    3. Is Appellant correct to construe the claim as limited to failure

2    analysis?

3    4. Is Appellant correct to construe the claim as precluding the use of a

4    mixture of liquid crystal materials?

5    5. Does Aszodi satisfy every limitation of the claim?

6    *ISSUE 1 – WHAT EFFECT, IF ANY, DOES THE EXPIRATION OF*
7    *THE '857 PATENT HAVE ON THE CONSTRUCTION OF CLAIM 11?*
8
9    A. Facts

10    As noted above, the '857 patent expired seven weeks after the First

11    Action was mailed and before Appellant's response thereto was filed.

12    B. Principles of Law

13    As explained in *In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359,

14    1364, 70 USPQ2d 1827, 1830 (Fed. Cir. 2004):

15    During examination, "claims . . . are to be given their
16    broadest reasonable interpretation consistent with the
17    specification, and . . . claim language should be read in light of
18    the specification as it would be interpreted by one of ordinary
19    skill in the art." *In re Bond*, 910 F.2d 831, 833 [15 USPQ2d
20    1566] (Fed. Cir. 1990); accord [*In re*] *Bass*, 314 F.3d [575,] 577
21    [65 USPQ2d 1156, 1158 (Fed. Cir. 2002)] ("[T]he PTO must
22    apply the broadest reasonable meaning to the claim language,
23    taking into account any definitions presented in the
24    specification.").

25    (Bracketed citations in USPQ2d version.) "[T]he claims themselves provide

26    substantial guidance as to the meaning of particular claim terms." *Phillips v.*

27    *AWH Corp.*, 415 F.3d 1303, 1314, 75 USPQ2d 1321, 1327 (Fed. Cir. 2005)

28    (en banc).

8

ISSI 00147

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    The policy basis for construing claims broadly during a reexamination

2    proceeding is explained as follows in *Am. Acad.*, 367 F.3d at 1364,

3    70 USPQ2d at 1830:

4          Construing claims broadly during prosecution is not
5    unfair to the applicant (or, in this case [a reexamination
6    proceeding], the patentee), because the applicant has the
7    opportunity to amend the claims to obtain more precise claim
8    coverage. *See [In re]* Yamamoto, 740 F.2d [1569,] 1571-72
9    [222 USPQ 934, 936 (Fed. Cir. 1984)] ("Applicants' interests
10    are not impaired since they are not foreclosed from obtaining
11    appropriate coverage for their invention with express claim
12    language. An applicant's ability to amend his claims to avoid
13    cited prior art distinguishes proceedings before the PTO from
14    proceedings in federal district courts on issued patents. When
15    an application is pending in the PTO, the applicant has the
16    ability to correct errors in claim language and adjust the scope
17    of claim protection as needed.").

18    We note that in *Ex parte Papst-Motoren*, 1 USPQ2d 1655 (Bd. Pat.

19    App. & Int. 1986), the Board held on rehearing that *Yamamoto's* "broadest

20    reasonable interpretation" standard was inapplicable because the patent had

21    expired before the Board issued its initial decision on appeal, which is also

22    the situation presented by the instant appeal.[17] The facts in *Papst-Motoren*

23    were as follows. PTO records show that the order authorizing reexamination

24    was issued on October 17, 1983. The patent expired on January 9, 1985,

25    which was prior to the Board's February 27, 1986, initial decision on appeal.

26    Papst-Motoren did not exercise its right to amend the patent claims or

27    propose new claims prior to expiration of the patent, at which time that right

---

[17] Neither the Examiner nor Appellant has addressed *Papst-Motoren* or *Ex parte Bowles*, 23 USPQ2d 1015, 1017 (Bd. Pat. App. & Int. 1991), which applies the claim construction standard of *Papst-Motoren*.

ISSI 00148

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   expired pursuant to 37 CFR § 1.530(d) (1986) ("No amended or new claims

2   may be proposed for entry in an expired patent. Moreover, no amended or

3   new claims will be incorporated into the patent by certificate issued after the

4   expiration of the patent."). Citing that provision, the Board held on

5   rehearing that

6       in reexamination proceedings in which the PTO is considering
7       the patentability of claims of an expired patent which are not
8       subject to amendment, a policy of liberal claim construction
9       may properly and should be applied. Such a policy favors a
10      construction of a patent claim that will render it valid, i.e., a
11      narrow construction, over a broad construction that would
12      render it invalid. *See Roberts Dairy Co. v. United States,*
13      530 F.2d 1342, 1367, [182 USPQ 218, 234] (Ct. Cl. 1976). *See*
14      *also, ACS Hosp. Systems, Inc. v. Montefiore Hosp.,* [732 F.2d
15      1572,] 1577, [221 USPQ 929, 932 (Fed. Cir. 1984)]).

16  *Papst-Motoren,* 1 USPQ2d at 1656.[18]

17

18

19

---

    [18] However, *Phillips,* 415 F.3d at 1327, 75 USPQ2d at 1336-37
explains that

        [w]hile we have acknowledged the maxim that claims should be
        construed to preserve their validity, we have not applied that
        principle broadly, and we have certainly not endorsed a regime
        in which validity analysis is a regular component of claim
        construction. *See Nazomi Communications [Inc. v. ARM*
        *Holdings, PLC],* 403 F.3d [1364,] 1368-69 [74 USPQ2d 1458,
        1461 (Fed. Cir. 2005)]. Instead, we have limited the maxim to
        cases in which "the court concludes, after applying all the
        available tools of claim construction, that the claim is still
        ambiguous." *Liebel-Flarsheim [Co. v. Medrad, Inc.],* 358 F.3d
        [898,] 911 [69 USPQ2d 1801, 1811 (Fed. Cir. 2004)] [other
        citations omitted].

10

ISSI 00149

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   C. Analysis

2       We decline to follow *Papst-Motoren*[19] because, in our view, it

3   misconstrues *Yamamoto*, which does not preclude application of the

4   "broadest reasonable interpretation" standard to reexamination proceedings

5   involving a patent that expired prior to entry of a Board decision on appeal.

6   Instead, *Yamamoto* explains that claim interpretation standard applies where

7   the patent owner had "an opportunity" to amend the claims, without

8   indicating how long such an opportunity must last:

9           An applicant's ability to amend his claims to avoid cited
10          prior art distinguishes proceedings before the PTO from
11          proceedings in federal district courts on issued patents.  When
12          an application is pending in the PTO, the applicant has the
13          ability to correct errors in claim language and adjust the scope
14          of claim protection as needed.  This opportunity is not available
15          in an infringement action in district court.  District court[s] may
16          find it necessary to interpret claims to protect only that which
17          constitutes patentable subject matter to do justice between the
18          parties. [*In re Prater*, 415 F.2d 1393,] 1404, 162 USPQ [541,]
19          550 [(CCPA 1969)].

20          The same policies warranting the PTO's approach to
21          claim interpretation when an original application is involved
22          have been held applicable to reissue proceedings because the
23          reissue provision, 35 U.S.C. § 251, permits amendment of the
24          claims to avoid prior art. *In re Reuter*, 651 F.2d [751,] 756,
25          210 USPQ [249,] 253-54 [(CCPA 1981)].  The reexamination
26          law, set forth below, gives patent owners the same right:

27              In any reexamination proceeding under this chapter,
28              the patent owner will be permitted to propose any

---

[19]   Neither *Papst-Motoren* nor *Bowles* constitutes binding precedent.
*See Standards of Operating Procedure 2 – Publication of Opinions and
Binding Precedent*  (Revision 6) (Aug. 10, 2005) (hereinafter "SOP2")
(available at: http://www.uspto.gov/web/offices/dcom/bpai/ stdproced.html).

11

ISSI 00150

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    amendment to his patent and a new claim or claims
2    thereto, in order to distinguish the invention as claimed
3    from the prior art cited under the provisions of section 301
4    of this title, or in response to a decision adverse to the
5    patentability of a claim of a patent. No proposed amended
6    or new claim enlarging the scope of a claim of the patent
7    will be permitted in a reexamination proceeding under this
8    chapter.

9    35 U.S.C. § 305 (1982).

10    Appellant therefore had an opportunity during
11    reexamination in the PTO to amend his claims to correspond
12    with his contribution to the art. The reasons underlying the
13    PTO's interpretation of the claims in reissue proceedings
14    therefore justify using the same approach in reexamination
15    proceedings.

16    *Yamamoto*, 740 F.2d at 1572, 222 USPQ at 936-37. In this reexamination

17    proceeding, the patent owner had an opportunity to amend the patent claims

18    or propose new claims in response to the rejection given in the First Action

19    but elected not to do so. This opportunity to amend continued for about

20    seven weeks, at which time the '857 patent expired.

21    D. Conclusion

22    In accordance with *Am. Acad.* and *Yamamoto*, we will give Claim 11

23    its broadest reasonable interpretation consistent with the disclosure of the

24    '857 patent.

25
26    *ISSUE 2 -- IS THE RELEVANT FIELD OF ENDEAVOR*
27    *LIMITED TO FAILURE ANALYSIS?*
28
29    A. Facts (many of which are also relevant to Issue 3, involving claim

30    interpretation)

31

12

ISSI 00151

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    *The specification of the '857 patent*

2        1. The title of the '857 patent is "Liquid Crystal Hot Spot Detection

3    With Infinitesimal Temperature Control."

4        2. The "Background of the Invention" portion ("Background") of the

5    '857 patent begins by explaining that liquid crystal materials are used for

6    "analyzing integrated circuits":

7            There are two distinct ways of using the liquid
8        crystal properties for analyzing integrated circuits. These
9        are:
10            (A) using the light scattering property of the liquid crystal
11        (see reference 3 [Fergason[20]] and 4 [Dixon[21]]), and
12            (B) the phase transition property of the liquid
13        crystal (see reference 1 [Hiatt[22]] and 2 [Fleuren[23]]).

14    Specification, col. 1, ll. 7-11.

15        3. The specification further explains that "[t]he invention uses the

16    phase transition property of the liquid crystal" and that "[t]herefore, the

17    discussion shall be limited to the hot spot detection method." *Id.* at col. 1, ll.

18    12-14. The specification does not define "detect," "hot spot," or "hot spot

19    detection method."

---

[20]  J. L. Fergason, *Liquid Crystals in Nondestructive Testing*,
7 Applied Optics 1729-37 (1968) (not in evidence).
[21]  G. D. Dixon, *Cholesteric Liquid Crystal in Nondestructive Testing*,
Materials Evaluation, Jun. 1977, pp. 51-55 (not in evidence).
[22]  John Hiatt, *A Method of Detecting Hot Spots on Semiconductors
Using Liquid Crystals*, 19th Annual Proceedings of the IEEE Reliability
Physics Symposium, 1981, pp. 130-3. Br. Ex. H.
[23]  E.M. Fleuren, *A Very Sensitive, Simple, Analysis Technique Using
Nematic Liquid Crystals*, 21st Annual Proceedings of the IEEE Reliability
Physics Symposium, 1983, pp. 148-49. Br. Ex. I; Reexam. Ex. 1 (a better
copy).

ISSI 00152

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    4. The specification discusses Hiatt and Fleuren without mentioning

2  that they concern failure analysis. Specifically, the specification explains

3  that the methods disclosed in Hiatt and Fleuren are unable to detect low-

4  power hot spots:

5      Both the cholesteric and nematic liquid crystal have been used
6      for detecting hot spot (see reference 1[Hiatt] and 2 [Fleuren]).
7      Hiatt . . . reported that with a cross polarized light and a LC-127
8      cholesteric liquid crystal, he obtained a spatial resolution of ten
9      to twenty microns. Also, the heating was not used, therefore
10     the lowest detectable power of the hot spot is in the range of
11     one hundred to two hundred milliwatts. [Fleuren] reported the
12     use of a N5 nematic liquid crystal phase to detect hot spots.
13     The particular nematic liquid he used is called N5. He used a
14     P.I.D. control and achieved a constant temperature of 0.1
15     degree [C]elsius to a specified temperature. He could routinely
16     detect a hot spot of 100 microwatts or more, with the P.I.D.
17     control. However, by chance, if the liquid crystal's ambient
18     temperature happens to be much less than 0.1 degree celsius
19     (say a 0.005 degree celsius) below the liquid crystal phase
20     transition temperature, he could detect a lower power hot spot.
21     He managed to detect a hot spot of 3.6 microwatts once.

22  Specification, col. 1, ll. 18-35.[24]

23    6. The specification asserts that Appellant's hot spot detection

24  method is capable of routinely detecting hot spots having powers of as low

25  as one or two microwatts. *Id.* at col. 1, ll. 57-62.

26    7. The "Summary of the Invention" ("Summary") in the specification

27  similarly explains that "[t]his invention invented [sic] a few processes that

28  significantly improve the effectiveness of the liquid crystal hot spot

_____

[24] The only other discussion of Hiatt and Fleuren in the '857 patent
(also in the Background) is to explain that "[p]rior to this invention, the
heating mode was either conductive (see reference 2 [Fleuren]) or no heating
at all (see reference 1 [Hiatt])." Specification, col. 1, ll. 47-49.

14

ISSI 00153

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   detection method in terms of the ability to detect the lowest power hot spot

2   on a die or wafer." *Id.* at col. 2, ll. 48-51.   The Summary makes no mention

3   of testing failed or defective devices.  Nor does the Abstract.

4        8.  In the "Detailed Description of the Invention" (cols. 4-7), the first

5   through penultimate paragraphs discuss applying the method of the

6   invention to a "device under test, "device under test 4," or "the die 17 or

7   wafer 40 under test" without indicating that the tested device, die, or wafer is

8   a failed or defective device. *Id.* at col. 5, ll. 16-22 and 30-31; col. 6, ll. 5-7,

9   20-29, and 58-60.  The first and only mention of a defective device in the

10  Detailed Description appears in the ultimate paragraph thereof:

11          For a typical pointed source hot spot of a typical
12          integrated circuit (for example, a filament type of short in
13          the diode of a[n] input pad of a DL 2416 integrated
14          circuit), this method has been shown to be able to locate
15          the center of the hot spot within 0.3 microns.

16  *Id.* at col. 7, ll. 55-59.

17       9.  None of the claims of the '857 patent identifies the device being

18  tested as a defective or failed device.

19       10.  The Examiner argues that "hot spot detection method" is broad

20  enough to read on causing a hot spot to be manifested visibly, whether or not

21  its location is already known and whether or not it corresponds to a failed

22  component, quoting the following definitions of "detect" in *The American*

23  *Heritage Dictionary of the English Language* (4th ed. 2000):  "1.  to

24  discover or ascertain the existence, presence, or fact of.  2.  to discern

25  (something hidden or subtle)" (hereinafter "*American Heritage* definitions").

26  Final Action 2-3.

ISSI 00154

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    11. Appellant argues that "hot spot detection method" is restricted to

2    discovering the location of a hot spot for the first time and thus refers to

3    detecting the location of a failed component, quoting the following

4    definitions of "detect" in *Webster's New World Dictionary, 2nd College*

5    *Edition* (date unknown): "finding something unknown" or "to catch or

6    discover something hidden or not easily noticed" (hereinafter "*Webster's*

7    definitions"). Br. 18.

8    12. As support for limiting the claimed "hot spot detection method"

9    to failure analysis, Appellant notes that Hiatt and Flueren, which Appellant

10   characterizes as incorporated by reference into the '857 patent, use their

11   disclosed hot spot detection techniques exclusively for failure analysis. As

12   further support, Appellant relies on Burgess/Tan and the declarations by Lim

13   and Jung.

14   *Hiatt (Br. Ex. H)*

15   13. The title of the Hiatt article is "A Method of Detecting Hot Spots

16   on Semiconductors Using Liquid Crystals." The term "hot spot" also

17   appears in Figure 2 (at 130).

18   14. Hiatt's abstract specifically addresses failure analysis:

19       This paper presents a failure analysis technique which
20       uses cholesteric liquid crystals and polarized light to
21       locate areas of high power dissipation on an integrated
22       circuit. The technique is non-destructive and can be
23       performed in a few minutes using common failure
24       analysis equipment. An example is given involving the
25       analysis of a CMOS latch-up mechanism.

26   Hiatt at 130.

27   15. Under the heading "Background," Hyatt explains that

28   "[c]holesteric liquid crystals have been used to map surface temperatures in

16

ISSI 00155

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   a wide variety of applications." Hiatt at 130, 2d para.  These applications

2   include making thermal "color maps" of the surfaces of monolithic

3   integrated circuits.  *Id.* at 130, 3d para.

4         16.  Under the heading "An Improved Method," Hiatt explains that his

5   improved method employs a polarizing microscope and that heating a region

6   of a cholesteric liquid crystal layer to a temperature above its cholesteric-

7   isotropic phase transition temperature will cause that region to appear as a

8   "black spot."  *Id.* at 130, 5th para.  The term "black spot" also appears at

9   page 131, paragraph 6, and in the caption for Figure 7 (at 132).

10        17.  The last paragraph under "Procedure" explains that "the method

11   has the potential to make accurate junction-to-case thermal resistance

12   measurements on semiconductors."  Hiatt at 131, 1st col.  There is no

13   indication that this type of measurement is to be performed on a failed or

14   defective device.

15        18.  Hiatt discloses two examples of failed integrated circuits on the

16   with the disclosed hot spot detection method was used: (a) a short circuit in a

17   CMOS integrated circuit, *id.* at 131, and (b) a CMOS latch-up mechanism.

18   *Id.* at 131.  Hiatt concludes by stating that the method "has been used

19   extensively to find the location of short circuits in integrated circuits, and it

20   is a powerful tool for studying CMOS latch-up mechanisms" *Id.* at 133.

21        *Fleuren (Br. Ex. I; Reexam. Ex. 1)*

22        19.  The title of the Flueren article is "A Very Sensitive, Simple,

23   Analysis Technique Using Nematic Liquid Crystals."  Reexam. Ex. 1.[25]

---

[25] The title is missing from the copy in evidence as Br. Ex. I.

17

ISSI 00156

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    20.  Fleuren's "Summary" explains that the paper "describes a fast,

2    cheap and nondestructive method to locate currents in semiconductors by

3    visualizing very small temperature differences." Fleuren at 148, 1st col.

4    21.  Under the heading "Introduction," Flueren explains that "[a]

5    common characteristic of a failing device is excess current and/or current on

6    [sic] the wrong time and/or place" and that nematic liquid crystals provide a

7    nondestructive, fast, cheap, simple, and very sensitive tool to locate these

8    currents. *Id.*  Fleuren further explains that "[o]ften knowing the exact

9    location of the failure is sufficient.  If not, additional analysis with e.g. a

10   SEM may be necessary." *Id.*

11   22.  Under the heading "Principle of Operation," Fleuren explains that

12   his technique employs a polarizing microscope and that any portion of the

13   liquid crystal material heated above its anisotropic-isotropic transition or

14   clearing temperature will appear as a "black spot." *Id.*

15   23.  Although Flueren employs the term "black spot" but not "hot

16   spot," the '857 patent is correct (at col. 1, ll. 24-25) to characterize Fleuren

17   as disclosing hot spot detection, because it would have been understood that

18   Fleuren's "black spots" are generated as the result of "hot spots."

19   24.  Under the heading "Applicability," Fleuren states that "[n]early

20   10 years of experience have proven this technique as very valuable in

21   (failure) analysis of semiconductor devices.  Almost any kind of current

22   conducting phenomena may be detected and/or localized." Fleuren at 148.

23   Fleuren further explains that "[e]xamples of defects visualized with this

24   technique are: parasitic and leakage currents, floating gates, isolation

25   defects, interconnect opens and shorts, leaky junctions, diffusion defects and

26   all kind of breakdown phenomena." *Id.*

18

ISSI 00157

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    25. Under the heading "Conclusion," Fleuren states that the disclosed

2    thermotropic use of nematic liquid crystals "is nondestructive, fast, cheap,

3    simple and very sensitive (.1 °C and 1 $\mu m^2$) technique.  It is applicable to all

4    kind of semiconductor processes and has proven itself over the years as

5    ideally suited for (failure) analysis purposes." *Id.* at 149.

6    *Stephens (Br. Ex. J; Reexam. Ex. 6)*

7    26. As rebuttal to Appellant's argument that "hot spot" detection is

8    limited to failed or defective devices, the examiner relies on C.E. Stephens

9    and F.N. Sinnadurai, *A Surface Temperature Limit Detector Using Nematic*

10    *Liquid Crystals with an Application to Microcircuits,* 7 Journal of Physics E:

11    Scientific Instruments 641-43 (1974) ("Stephens").  Answer 11.

12    27. Stephens discloses using any of various nematic liquid crystal

13    materials for "hot spot detection" in microcircuitry that is not characterized

14    as including a failed device:

15    **3.3 Microcircuit hot spot detection**
16    To illustrate the use of the technique in locating hot spots
17    in microcircuits, an operational amplifier was coated with
18    a nematogen film.  Bias was applied to the circuit and the
19    power dissipation increased until a dark area appeared in
20    the film[,] which happened at the contact between a
21    metal track and a diffused resistor (figure 4).  The
22    nematogen was then removed from the microcircuit
23    surface, and the area around the hot spot was investigated
24    with the infrared microradiometer, figure 5 indicating
25    surface temperatures at various points in the vicinity of
26    the hot spot.  The isotropic transition of the nematogen
27    gives a clearly visible profile confirming the infrared
28    microradiometer measurements, but without the need for
29    reference to calibrations.

19

ISSI 00158

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   Stephens at 642, 2d col.  Stephens further explains, under the heading

2   "3.4 Isothermal plotting," that

3           [t]o assist in microcircuit design evaluation, the
4           technique may be used to obtain isotherms of the die
5           surface. . . .
6                   An increase in the hot stage temperature results in
7           the same increase in the device surface temperature, thus
8           producing dark areas wherever the threshold temperature
9           is exceeded; successive incremental increases in hot stage
10          temperature enable an isothermal profile to be built up.

11  Stephens at 643, 1st col.[26]

12          *Sinnadurai (Br. Ex. L; Reexam. Ex. 4)*

13          28.  The two authors of the Stephens article (i.e., C.E. Stephens and

14  F.N. Sinnadurai) are two of the three inventors named in British Patent

15  Specification No. 1,442,802, entitled "Temperature Measurement Using

16  Liquid Crystals" (hereinafter "Sinnadurai").

17          29.  Sinnadurai discloses using the anisotropic-isotropic transition

18  temperature of a liquid crystal material to locate a plurality of isotherms

19  which can be used to generate a temperature profile of an active integrated

20  circuit device.  Sinnadurai at 1, ll. 10-15.

21                  In the case, for example, of the surface of an
22          electrical component having a temperature field across it
23          by virtue of an electrical dissipation within it, a
24          temperature profile for the component surface can be
25          built up by determining positions of isotherms for
26          differing ambient temperatures of the component by the
27          method described hereinbefore.

28  *Id.* at 1, ll. 81-89.

---

[26]  As explained *infra*, Aszodi likewise uses the results of plural
detection processes to form an isothermal profile of a device.

20

ISSI 00159

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    30.  In a specific example, the disclosed method employs a nematic

2    liquid crystal material (p. 2, l. 31) to generate isotherms for creating a

3    temperature profile of a nichrome resistor (p. 2, l. 5), which is not

4    characterized as failed or defective.  *Id.* at 2, ll. 110-16.  Sinnadurai explains

5    that "due to thermal diffusion in the liquid crystal, the visible dark regions

6    12 are slightly larger than their associated component hot spots."  *Id.* at 2,

7    ll. 117-20.

8    31.  In addition to being used to generate thermal profiles,

9    [t]he method of the invention . . . may alternatively be
10    used in the detection of a thermal limit to test integrated
11    circuits against procurement specifications that set an
12    upper limit to surface temperatures.  In the latter
13    application a nematogen is selected having an upper
14    threshold temperature equal to the specification upper
15    limit.

16    *Id.* at 2, l. 129 to p. 3, l. 6.

17    *Burgess/Tan (Br. Ex. E; Reexam. Ex. 3)*

18    32.  The title of the Burgess/Tan article, which Appellant

19    characterizes as incorporated by reference into the '857 patent (Br. 9-10), is

20    "Improved Sensitivity for Hot Spot Detection Using Liquid Crystals."

21    33.  The "Introduction" explains that "[l]iquid crystals have been used

22    for failure analysis for several years" and briefly describes the disclosures of

23    the Hiatt and Fleuren articles.  Burgess/Tan at 119.

24    34.  Burgess/Tan describes hot spot detection using K-18 nematic

25    liquid crystal material.  *Id.* at 119-20, under heading "Liquid Crystal

26    Selection."

21

ISSI 00160

Appeal 2006-3235
Reexamination Control No. 90/006,696

1     35.  The article does not mention using either hot spot detection in

2  general or the disclosed hot spot detection method for applications other than

3  failure analysis.

4     *Jung's and Lim's Rule 132 declarations (Br. Exs. F and G)*

5     36.  Jung and Lim each claim to be a person having ordinary skill in

6  the art of failure analysis.  Jung Decl. para. 3; Lim Decl. para. 1.

7     37.  Jung testified that the '857 patent is "exclusively within the field

8  of semiconductor failure analysis" and that "the term 'detecting hot spot' in

9  claim 11 of the '857 patent has the same meaning as in the field of semi-

10  conductor failure analysis." Jung Decl. para. 8.  Lim similarly testified that

11  "in the '857 patent specification, the term 'hot spot detection method' means

12  nothing but a failure analysis method."  Lim Decl. para. 5.

13     38.  Both declarants testified that a person having ordinary skill in

14  failure analysis would have understood that the hot spot detection method

15  disclosed in the '857 patent necessarily includes locating the center of the

16  hot spot in order to identify the site of a failed component whose location

17  was not previously known.  Jung Decl. paras. 6-10; Lim Decl. paras. 3-10.

18  Both declarants base that testimony on the example of a shorted diode given

19  in the '857 patent specification and on the Hiatt and Fleuren articles.  Jung

20  Decl. paras. 9-10; Lim Decl. paras. 6-10.

21     39.  Jung does not address Stephens or Sinnadurai, which describe

22  using hot spot detection to generate isotherms and thermal profiles of

23  nondefective devices.  Lim discusses Stephens and Sinnadurai without

24  acknowledging that aspect of their disclosures.  Lim Decl. paras. 16-17.

25

26

ISSI 00161

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    *Burgess's Rule 131 declaration (Reexam. Request Attachment 1).*

2    40.   Appellant correctly notes (Br. 16) that Mr. Burgess's Rule 131

3    declaration, filed with the Reexamination Request, implicitly limits the

4    relevant field of endeavor to failure analysis by asserting that the subject

5    matter of Claim 11 would have been "obvious to a person having ordinary

6    skill in the field of failure analysis, generally, or hot spot detection,

7    specifically" (Burgess Decl. at 7, para. 27) and "obvious to a person having

8    ordinary skill in the field of fault analysis" (*id.* at 12, para. 44).

9    *The Reexamination Request*

10   38.   As noted by Appellant (Br. 16), the Reexamination Request

11   (signed by Requester's counsel, Mr. Westerlund) asserts: "The '857 patent

12   discloses a particular method of detecting hot spots on a die or wafer under

13   test, also referred to as a Device Under Test ('DUT').  Hot spots are

14   produced at locations on a *failed* integrated circuit ("IC") wafer or die . . . ."

15   Reexam. Request 1 (our emphasis).

16   B.  Principles of law

17   The relevant field of endeavor must be determined before the claims

18   can be construed.  *See Phillips*, 415 F.3d at 1313, 75 USPQ2d at 1326

19   ("claims are construed . . . as they would be understood by persons in the

20   same field of endeavor").

21   As explained in *In re Bigio*, 381 F.3d 1320, 72 USPQ2d 1209 (Fed.

22   Cir. 2004), addressing the "field of endeavor" test for determining whether

23   cited prior art is analogous[27]:

---

[27]   As explained in *Bigio*, 381 F.3d at 1325, 72 USPQ2d at 1212:

23

ISSI 00162

Appeal 2006-3235
Reexamination Control No. 90/006,696

1      [The field of endeavor] test for analogous art requires the PTO
2      to determine the appropriate field of endeavor by reference to
3      explanations of the invention's subject matter in the patent
4      application, including the embodiments, function, and structure
5      of the claimed invention. *See Wood*, 599 F.2d at 1036
6      [202 USPQ at 174] (confining the field of endeavor to the scope
7      explicitly specified in the background of the invention); *see*
8      *also Deminski*, 796 F.2d at 442 [230 USPQ at 315]
9      (determining that the cited references were within the same
10

11     field of endeavor where they "have essentially the same
12     function and structure").

13   381 F.3d at 1321, 72 USPQ2d at 1212 (bracketed citations in USPQ2d

14   version.) The issue of what constitutes the relevant "field of endeavor" is a

15   question of fact. *See Bigio*, 381 F.3d at 1324, 72 USPQ2d at 1211 ("The

16   identification of analogous prior art is a factual question.").

17       The specification includes any subject matter properly incorporated by

18   reference therein. As explained in *Cook Biotech, Inc. v. ACell, Inc.*,

19   460 F.3d 1365, 1376, 79 USPQ2d 1865, 1872 (Fed. Cir. 2006):

20        "Incorporation by reference provides a method for
21     integrating material from various documents into a host
22     document . . . by citing such material in a manner that makes
23     clear that the material is effectively part of the host document as

---

Two separate tests define the scope of analogous prior art:
(1) whether the art is from the same field of endeavor,
regardless of the problem addressed and, (2) if the reference is
not within the field of the inventor's endeavor, whether the
reference still is reasonably pertinent to the particular problem
with which the inventor is involved. *In re Deminski*, 796 F.2d
436, 442 [230 USPQ 313] (Fed. Cir. 1986); *see also In re*
*Wood*, 599 F.2d 1032, 1036 [202 USPQ 171] (CCPA 1979).
(Bracketed citations in USPQ2d version.)

24

ISSI 00163

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    if it were explicitly contained therein." *Advanced Display Sys.,*
2    *Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 [54 USPQ2d
3    1673] (Fed. Cir. 2000) (citations omitted). "To incorporate
4    material by reference, the host document must identify with
5    detailed particularity what specific material it incorporates and
6    clearly indicate where that material is found in the various
7    documents." *Id.* (citations omitted). Whether and to what
8    extent material has been incorporated by reference into a host
9    document is a question of law. *Id.*
10   (Bracketed citations in USPQ2d version.)

11       Expert testimony can be useful to establish that a term had a particular

12   meaning in the art as well as to provide background on the technology at

13   issue and explain how an invention works. *Phillips*, 415 F.3d at 1318,

14   75 USPQ2d at 1330. However, "the Board is entitled to weigh the

15   declarations and conclude that the lack of factual corroboration warrants

16   discounting the opinions expressed in the declarations." *Am. Acad.,*

17   367 F.3d at 1368, 70 USPQ2d at 1833.

18       Finally, unsubstantiated attorney argument is no substitute for

19   competent, substantiated expert testimony. *Invitrogen Corp. v. Clontech*

20   *Laboratories, Inc.*, 429 F.3d 1052, 1068, 77 USPQ2d 1161, 1172 (Fed.

21   Cir. 2005.

22   C.  Analysis

23       The "Background" portion of the specification of the '857 patent

24   begins by explaining that there two known ways of using liquid crystals for

25   "analyzing integrated circuits" col. 1, ll. 6-7, and that the prior art methods

26   disclosed in Hiatt and Fleuren employ the phase transition property. *Id.* at

27   col. 1, ll. 10-11. The specification then goes on to explain that "[t]he

28   invention uses the phase transition property of the liquid crystal" and that

25

ISSI 00164

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    "[t]herefore, the discussion shall be limited to the hot spot detection

2    method." *Id.* at col. 1, ll. 12-14. The foregoing statements, in our view,

3    identify the relevant field of endeavor as the use of the phase transition

4    property of liquid crystal materials to detect "hot spots" in integrated circuits

5    without regard to whether they include failed or defective components. For

6    the following reasons we reject Appellant's position that the specification of

7    the '857 patent further restricts the field of endeavor to failure analysis, i.e.,

8    the detection of hot spots generated by failed or defective components.

9          Appellant argues that failure analysis is implied by the phrase "hot

10   spot detection." Specifically, Appellant contends (1) that "hot spot

11   detection" means discovering the location of a hot spot for the first time,

12   citing the *Webster's* definitions (i.e., "finding something unknown" or "to

13   catch or discover something hidden or not easily noticed") and (2) that the

14   only type of hot spot whose location is unknown prior to performance of the

15   detection method is a hot spot generated by a failed component. Br. 19-20.

16   The Examiner, on the other hand, argues that "hot spot detection" is broad

17   enough to read on causing a hot spot to be manifested visibly, whether or not

18   its location is already known, presumably relying on the second part of the

19   *American Heritage* definition ("1. to discover or ascertain the existence,

20   presence, or fact of. 2. to discern (something hidden or subtle)"). Final

21   Action 3. As will appear, the Examiner's broader interpretation is both

22   reasonable and consistent with the '857 patent disclosure.

23         As further support for restricting "hot spot detection method" to

24   failure analysis, Appellant argues that Hiatt and Fleuren are incorporated by

25   reference into the '857 patent and disclose using their spot detection

26   methods exclusively for failure analysis. This argument fails for several

ISSI 00165

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    reasons. First, although Claim 11 is to be given the broadest reasonable

2    interpretation consistent with the disclosure of the '857 patent, that

3    disclosure does not include the entirety of the disclosures of the Hiatt and

4    Fleuren articles. The '857 patent fails to indicate that Hiatt and Fleuren are

5    incorporated by reference, let alone explain which parts which are being

6    incorporated, as required to achieve a legally effective incorporation by

7    reference. *Cook Biotech,* 460 F.3d at 1376, 79 USPQ2d at 1872. As a

8    result, Hiatt and Fleuren are part of the '857 patent only to the extent they

9    are discussed in the patent, which does not mention that they address only

10   failure analysis.

11         Even assuming for the sake of argument that Hiatt and Fleuren are

12   incorporated by reference in their entirety, Appellant's argument fails

13   because nothing in those articles indicates that "hot spot detection" is a term

14   of art that necessarily refers to failure analysis. To the contrary, Hiatt and

15   Fleuren suggest that their methods are not limited to failure analysis. Hiatt,

16   in the last paragraph under the heading "Procedure," explains that "the

17   method has the potential to make accurate junction-to-case thermal

18   resistance measurements on semiconductors," Hiatt at 131, an application

19   which has not been demonstrated or even asserted to involve defective

20   semiconductors. Fleuren explains in his "Conclusion" (at 149) that the

21   disclosed thermotropic use of nematic liquid crystals "is applicable to all

22   kind of semiconductor processes and has proven itself over the years as

23   ideally suited for (failure) analysis purposes." The inclusion of "failure" in

24   parentheses ahead of "analysis" suggests that failure analysis is only one

25   type of analysis for which the method is suited.

ISSI 00166

Appeal 2006-3235
Reexamination Control No. 90/006,696

1      Appellant also places undue reliance on the fact that the sole example

2    of a hot spot given in the '857 patent is a hot spot generated by a failed

3    diode. The passage in question reads:

4             For a typical pointed source hot spot of a typical
5             integrated circuit (for example, a filament type of short in
6             the diode of a[n] input pad of a DL 2416 integrated
7             circuit), this method has been shown to be able to locate
8             the center of the hot spot within 0.3 microns.

9    Specification, col. 7, ll. 55-59. This discussion of a specific example would

10    not have been understood to restrict Appellant's field of endeavor to failure

11    analysis. In the first place, the short-circuited diode is characterized as a

12    "typical pointed source hot spot," not as a "typical hot spot." Second, even

13    if the passage had characterized a short-circuited diode is a "typical hot

14    spot," its effect would simply have been to identify a nonlimiting example of

15    a hot spot.

16      For the foregoing reasons, the relevant field of endeavor set forth in

17    the specification appears to be the analysis of defective and nondefective

18    integrated circuits by using the phase transition property of liquid crystal

19    materials to detect "hot spots," i.e., areas having a temperature in excess of a

20    predetermined temperature.

21      As further evidence that the field of endeavor of the '857 patent would

22    have been understood to be limited to failure analysis, Appellant relies on

23    the 37 C.F.R. § 1.132 declarations by Jung and Lim, each of whom

24    identified his area of expertise as failure analysis, Jung Decl. para. 3; Lim

25    Decl. para. 1, and testified that a person having ordinary skill in the art of

26    failure analysis would have understood the '857 patent to be limited to

27    failure analysis. Jung Decl. para. 8; Lim Decl. para. 5. For purposes of this

28

ISSI 00167

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    discussion, we assume that both have the qualifications to testify in that

2    capacity; the examiner does not contend otherwise.

3         Because Jung and Lim are testifying as persons having ordinary skill

4    in the field of failure analysis, their testimony sheds little light on the

5    question of how the phrase "hot spot detection method" as used in the '857

6    patent would have been understood by a person having ordinary skill in the

7    broader field of endeavor indicated by the '857 patent, i.e., the use of liquid

8    crystals to detect hot spots in defective and nondefective integrated circuits.

9    Their testimony is also unpersuasive even if we assume for the sake of

10   argument that they are testifying as persons having ordinary skill in that

11   broader field of endeavor.  They have not testified that an artisan in that

12   broader field of endeavor would have understood the terms "hot spot" and

13   "hot spot detection" to be terms of art limited to failure analysis.  Nor could

14   they have given such testimony, since Stephens and Sinnadurai, which are in

15   that field of endeavor, describe using their "hot spot" detection methods on

16   nondefective devices for the purpose of generating isotherms and

17   temperature profiles, Stephens at 643 (under heading "3.4 Isothermal

18   Plotting"); Sinnadurai at 2, ll. 110-20, and also for testing integrated circuits

19   against procurement specifications that set an upper limit to surface

20   temperatures.  Sinnadurai at 2, l. 129 to p. 3, l. 9.  Instead, they testified that

21   the artisan would have would have understood the phrase "hot spot detection

22   method" as used in the '857 patent to be limited to failure analysis.  As

23   support for this conclusion they rely on the shorted-diode example given in

24   the '857 patent and on Hiatt and Fleuren, which reliance is misplaced for the

25   reasons given above.

29

ISSI 00168

Appeal 2006-3235
Reexamination Control No. 90/006,696

1      For the foregoing reasons, the testimony of Jung and Lim fails to

2    persuade us that the term "hot spot detection method" in the specification

3    and Claim 11 of the '857 patent would have been understood to be limited to

4    failure analysis.

5      Turning now to Burgess/Tan, that article is not even mentioned in the

6    specification of the '857 patent, let alone incorporated by reference therein.

7    Appellant is incorrect to treat it as incorporated by reference simply because

8    it was cited during the prosecution of the '857 patent (Br. 9-10).  Also, while

9    it is true, as Appellant notes, that this article discusses hot spot detection

10    solely in the context of failure analysis, this does not demonstrate that the

11    terms "hot spot" and "hot spot detection method" would have been

12    understood to be limited to failure analysis by persons working in the

13    broader field of endeavor indicated by the '857 patent.

14      Appellant's reliance on Mr. Burgess's characterization of the field of

15    endeavor of the '857 patent as "the field of failure analysis" (Burgess Decl.

16    at 7, para. 27) and "the field of fault analysis" (*id.* at 12, para. 44) is

17    misplaced because that characterization is unsupported by any analysis.

18    *Am. Acad.*, 367 F.3d at 1368, 70 USPQ2d at 1833.

19      Appellant's reliance on the fact that the Reexamination Request

20    (signed by Mr. Westerlund) describes hot spots as being produced by failed

21    integrated circuits is misplaced because that description is unsubstantiated

22    attorney argument, which is no substitute for competent, substantiated expert

23    testimony. *Invitrogen*, 429 F.3d at 1068, 77 USPQ2d at 1172.

24      D. Conclusion

25      We hold that the relevant field of endeavor is the analysis of defective

26    and nondefective integrated circuits by using the phase transition property of

ISSI 00169

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   liquid crystal materials to detect a "hot spot," which is a region having a

2   temperature higher than a predetermined temperature.

3

4   *ISSUE 3 – IS CLAIM 11 LIMITED TO FAILURE ANALYSIS?*

5   A. Facts

6       The relevant facts are the same facts given above in the discussion of

7   the field of endeavor.

8   B. Principles of Law

9       As explained above, Claim 11 will be given its broadest reasonable

10  interpretation consistent with the patent specification. *Am. Acad.*, 367 F.3d

11  at 1364, 70 USPQ2d at 1830; *Yamamoto*, 740 F.2d at 1571-72, 222 USPQ2d

12  at 936. While such claim interpretation must take into account any

13  definitions presented in the specification, *Am. Acad.*, 367 F.3d at 1364,

14  70 USPQ2d at 1830, limitations from examples given in the specification are

15  not to be read into the claims. *Constant v. Advanced Micro-Devices, Inc.*,

16  848 F.2d 1560, 1571, 7 USPQ2d 1057, 1064 (Fed. Cir. 1988). Nor is it

17  proper to construe claims as limited to a preferred or sole embodiment.

18  *Conoco, Inc. v. Energy & Envtl. Int'l LC*, 460 F.3d 1349, 1357-58, 79

19  USPQ2d 1801, 1807 (Fed. Cir. 2006) .

20  C. Analysis

21      For purposes of this appeal, we are construing Claim 11 to recite

22  using "liquid crystal" to detect hot spots in a die or wafer, wherein the liquid

23  crystal comprises K-18, or K-15, or K-21, or K-24, or K-27, or K-30, or K-

31

ISSI 00170

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   33, or K-36.[28]  This appears to be the interpretation adopted by the Examiner

2   and Appellant.  Had the Examiner been of the view that the claim simply

3   recites the liquid crystals materials in the alternative, he presumably would

4   have rejected the claim for anticipation by K-18, which the specification

5   indicates was obtained from E.M. Chemicals.  Specification, col. 1,

6   ll. 61- 64.

7        As support for construing the term "hot spot detection method" in the

8   claim as limited to failure analysis, Appellant, Jung, and Lim essentially

9   repeat their arguments for construing the field of endeavor as limited to

10  failure analysis, arguments which are unconvincing for the reasons given

11  above.  Their reliance on the '857 patent's example of a short-circuited

12  diode to limit the claimed "hot spot detection method" to failure analysis

13  constitutes an improper attempt to read a disclosed example into the claim,

14  *Constant*, 848 F.2d at 1571, 7 USPQ2d at 1064, or limit the claim to the sole

15  disclosed embodiment.  *Conoco*, 460 F.3d at 1357-58, 79 USPQ2d at 1807.

---

[28]  In the civil action, it was argued that a new use of a known composition must be claimed as a process under 35 U.S.C. §§ 101 and 100(b) and that Claim 11 is unpatentable because the limitation "for detecting hot spot on die or wafer with a hot spot detection method" recites an intended use rather than a process step.  *See In re Moreton*, 288 F.2d 708, 709, 129 USPQ 227, 228 (CCPA 1961) ("[S]ince one cannot claim a new use per se, because it is not among the categories of patentable inventions specified in 35 U.S.C. 101, [the invention] is claimed as a method, as permitted by 35 U.S.C. 100(b)."); *In re Wiggins*, 397 F.2d 356, 359 n.4, 158 USPQ 199, 201 n.4 (CCPA 1968).  It was further argued that because Claim 11 attempts to claim a process without reciting any process steps, it fails the definiteness requirement of 35 U.S.C. § 112, second paragraph. Because reexamination proceedings may not consider these issues for original claims, we express no opinion on those issues.

32

ISSI 00171

Appeal 2006-3235
Reexamination Control No. 90/006,696

1      Appellant's contention that the claimed "detecting hot spot on die or

2   wafer with a hot spot detection method" requires locating the "center" of the

3   hot spot (Br. 18) is unpersuasive because it presumes, incorrectly, that the

4   claimed is limited to failure analysis. Moreover, even assuming the claim

5   were limited to failure analysis, it would not require locating the center of

6   the hot spot rather than just the outline of the hot spot.

7      For the foregoing reasons, we hold that the phrase "detecting hot spot

8   on die or wafer with a hot spot detection method" in Claim 11 would not

9   have been understood to be limited to detecting a hot spot in a failed or

10   defective device.

11   D. <u>Conclusion</u>

12      Claim 11 is not limited to failure analysis.

13         *ISSUE 4 – DOES CLAIM 11 PRECLUDE THE USE*
14         *OF A MIXTURE OF LIQUID CRYSTAL MATERIALS?*

15   A. <u>Facts</u>

16      1. Claim 11 reads in pertinent part as follows:

17         11. A new use of liquid crystal for detecting hot
18   spot on die or wafer with a hot spot detection method,
19   said liquid crystal comprises:
20         . . . K-18 nematic liquid crystal, or
21         . . . K-15 nematic liquid crystal; or
22         . . . K-21 nematic liquid crystal; or
23         . . . K-24 nematic liquid crystal; or
24         . . . K-27 nematic liquid crystal; or
25         . . . K-30 nematic liquid crystal; or
26         . . . K-33 nematic liquid crystal; or
27         . . . K-36 nematic liquid crystal.
28

33

ISSI 00172

Appeal 2006-3235
Reexamination Control No. 90/006,696

1      2. The only liquid crystal material mentioned in the "Detailed

2  Description of the Invention" is K-18. (The other seven recited liquid

3  crystal materials are mentioned only in Claim 11.)

4      3. The specification does not mention using a mixture of liquid

5  crystals or liquid crystal materials for hot spot detection.

6  B. Principles of Law

7      "The word "comprising" transitioning from the preamble to the body

8  signals that the entire claim is presumptively open-ended." *Gillette Co. v.*

9  *Energizer Holdings, Inc.*, 405 F.3d 1367, 1371, 74 USPQ2d 1586, 1590

10  (Fed. Cir. 2005).[29] A preamble is "an introductory phrase that may

11  summarize the invention, its relation to the prior art, or its intended use or

12  properties." Donald S. Chisum, 3 *Chisum on Patents* § 8.06[1][b][ii] (2003).

13      Nontransitional occurrences of "comprising" and "comprises" are

14  "interpreted according to the normal rules of claim interpretation."

15  *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 n.8,

16  229 USPQ 805, 812 n.8 (Fed. Cir. 1986). As noted by Appellant, a

17  nontransitional occurrence of "comprising" was given a closed construction

18  in *Moleculon,* 793 F.2d at 1272 n.8, 229 USPQ at 812 n.8. However,

19  nontransitional occurrences of "comprising" were construed as open-ended

20  in *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1329, 73 USPQ2d 1191,

---

[29] In contrast, the transitional phrase "consisting of" signifies
restriction and exclusion of unrecited steps or components, *Conoco*,
460 F.3d at 1360, 79 USPQ2d at 1808 (citing MPEP § 2111.03), and the
transitional phrase "consisting essentially of" excludes ingredients that
would materially affect the basic and novel characteristics of the claimed
composition. *Atlas Powder Co. v. E.I. Du Pont De Nemours & Co.*,
750 F.2d 1569, 1574, 224 USPQ 409, 412 (Fed. Cir. 1984).

34

ISSI 00173

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    1194 (Fed. Cir. 2004) and *Georgia-Pacific Corp. v. U.S. Gypsum Co.*,

2    195 F.3d 1322, 52 USPQ2d 1590 (Fed. Cir. 1999), discussed infra.

3    C. Analysis

4        Appellant alternatively argues (1) that the term "comprises" in

5    Claim 11 is not used as a transitional term and thus should be construed as

6    closed and (2) that even assuming "comprises" is used as a transitional term,

7    the resulting presumption of open-endedness of the claim has been rebutted

8    by other language in the claim.

9        As support for the argument that "comprises" in Claim 11 is not a

10   transitional term, Appellant contends that the language which precedes that

11   term does not fit the above definition of "preamble" given in *Chisum on*

12   *Patents* ("an introductory phrase that may summarize the invention, its

13   relation to the prior art, or its intended use or properties") Br. 25. Because

14   Claim 11 is not in the format of a conventional process or apparatus claim,

15   we agree with Appellant that "comprising" as used therein is not a

16   "transitional" term in the sense of the case law holding that transitional uses

17   of "comprises" and "comprising" create a presumption that the claim is

18   open-ended rather than closed.

19       As a result, we will construe "comprising" in Claim 11 according to

20   the normal rules of claim construction, *Moleculon*, 793 F.2d at 1272 n.8,

21   229 USPQ at 812 n.8, which in this reexamination proceeding is the

22   broadest reasonable interpretation consistent with Appellant's disclosure.

23   *Amer. Acad.*, 367 F.3d at 1364, 70 USPQ2d at 1830; *Yamamoto*, 740 F.2d at

24   1572, 222 USPQ at 936-37.

25       The broadest reasonable interpretation of a nontransitional occurrence

26   of "comprises" has been held to be open-ended one. As explained in *Versa*:

35

ISSI 00174

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    After setting forth the "means . . . for creating air channels"
2    limitation, that limitation is further defined by the next clause of
3    the claim, which reads: "said means for creating air channels
4    comprising positioning means which positions at least one
5    elongated, perforated pipe . . . . '910 patent, col. 4, ll. 13-15.
6    Although *"comprising" language is not limiting and may*
7    *include features not recited in the claim,* such language cannot
8    be read to require other structure.

9    392 F.3d at 1329, 73 USPQ2d at 1194 (emphasis added).  Also, *Georgia-*

10   *Pacific* gave an open-ended construction to the phrase "said mat comprising

11   randomly distributed glass fibers bonded by an adhesive material" in the

12   body of Claim 1 of Patent 4,810,569.  As support, the court quoted MPEP

13   § 2111.03 (6th ed. 1997) ("The transitional term 'comprising' . . . is

14   inclusive or open-ended and does not exclude additional , unrecited elements

15   or method steps") and also cited *Moleculon* and *In re Baxter*, 656 F.2d 679,

16   210 USPQ 795 (CCPA 1981).  *Georgia-Pacific*, 195 F.3d at 1327-28 & n.4,

17   52 USPQ2d at 1595 & n.4.

18   Appellant is therefore incorrect to cite *Moleculon* as support for the

19   general proposition that a nontransitional occurrence of "comprises" or

20   "comprising" should be treated as a closed term.  Furthermore, it is clear that

21   *Moleculon's* closed construction of the nontransitional term "comprising"

22   was due to the structure of the involved claim, which read:

23   3. A method for restoring a preselected pattern
24   from sets of pieces which pieces have constantly exposed
25   and constantly nonexposed surfaces, the exposed surfaces
26   adapted to be combined to form the preselected pattern,
27   which sets when in random engagement fail to display
28   said preselected pattern which *comprises*:
29   a. engaging eight cube pieces as a composite cube;
30   b. rotating a first set of cube pieces *comprising*
31   four cubes about a first axis;

36

ISSI 00175

Appeal 2006-3235
Reexamination Control No. 90/006,696

| | |
|---|---|
| 1 | c. rotating a second set of four cubes about a |
| 2 | second axis; and |
| 3 | d. repeating steps (b) and (c) until the preselected pattern is |
| 4 | achieved. |

5    793 F.2d at 1263, 229 USPQ at 806-07 (emphasis added).  The court

6    construed the nontransitional "comprising" in step (b) as closed rather than

7    open-ended because steps (a) and (c) differed from step (b) by not

8    employing "comprising" or a similar term:

| | |
|---|---|
| 9 | 8. During the oral argument, Moleculon argued |
| 10 | that the word "comprising" in step (b) ("rotating a first |
| 11 | set of cube pieces comprising four cubes about a first |
| 12 | axis") means that the step covers four cubes or more. |
| 13 | "Comprising" is not used here as a transitional phrase |
| 14 | and has no special legal effect as such.  Hence, it should |
| 15 | be interpreted according to the normal rules of claim |
| 16 | interpretation.  No analogous word precedes the |
| 17 | structural recitation of the number of cube pieces in steps |
| 18 | (a) and (c).  "Comprising" in step (c) [sic, (b)] reasonably |
| 19 | interpreted means "having" but not "having at least." |

20    *Moleculon*, 793 F.2d at 1272 n.8, 229 USPQ at 812 n.8.  This *Moleculon*

21    holding clearly has no applicability to Appellant's Claim 11, which does not

22    recite a plurality of steps, let alone at least one step that employs the term

23    "comprises" or "comprising" and at least one step that does not.

24    For the foregoing reasons, we hold that "comprises" in Claim 11 is

25    nontransitional and open-ended and thus does not preclude the claimed

26    "liquid crystal" from being part of a mixture containing another liquid

27    crystal material.

28    We would have reached the same conclusion regarding the scope of

29    Claim 11 even if we had held that "comprises" is used therein as a

30    transitional term and thus renders the claim presumptively open-ended.

ISSI 00176

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    As support for the argument that that even if "comprises" in Claim 11 is a

2    transitional term, the resulting presumption of open-endedness of the claim

3    has been rebutted, Appellant cites several decisions.  The first is *Innovad,*

4    *Inc. v. Microsoft Corp.*, 260 F.3d 1326, 59 USPQ2d 1676 (Fed. Cir. 2001),

5    which held that the presumption of open-endedness of a claim that employed

6    "comprising" as a transitional term had been rebutted to some extent by the

7    use of the term "single" in a paragraph (designated f by the court) in the

8    body of the claim.  That paragraph read: "a single, bi-state switch operable

9    from the exterior of said case for activating said signal means to produce

10   said sequence of dual tone modulated frequency signals during said dialing

11   mode corresponding to said digits in said reprogrammable memory

12   means."[30]  The court held that although the transitional term "comprising"

13   permits more than one bi-state switch, "[t]he term 'single,' however,

14   precludes the use of multiple [bi-state] switches to perform the activating

15   function for one phone number."  260 F.3d at 1333, 59 USPQ2d at 1681.

16   This decision has no bearing on Appellant's Claim 11, which does not

17   employ the term "single" or an equivalent term.

18        Appellant (Br. 31) also relies on *AbTox, Inc. v. Exitron Corp.*,

19   122 F.3d 1019, 43 USPQ2d 1545 (Fed. Cir.), *modified on reh'g*, 131 F.3d

20   1009, 46 USPQ2d 1735 (Fed. Cir. 1997), wherein the court construed the

21   claim term "a gas-confining chamber" to mean a single gas-confining

22   chamber, noting, *inter alia*, that "[r]epeatedly, the claim refers to 'said

23   chamber' as its describes various portions of the apparatus.  This term itself,

24   'said chamber,' reinforces the singular nature of the chamber."  122 F.3d at

---

[30]  The claim (claim 22) is reproduced in *Innovad* at 260 F.3d at 1329,
59 USPQ2d at 1677-78.

38

ISSI 00177

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   1024, 43 USPQ2d at 1548. This holding has no relevance to Appellant's

2   Claim 11, which includes only one occurrence of "said liquid crystal."

3        Another argument by Appellant for treating the presumption of open-

4   endedness as rebutted is that in contrast to the terms "method" and

5   "process," which inherently are open-ended, the term "liquid crystal" used in

6   the preamble of the claim would have been understood to mean "a single

7   liquid crystal." Br. 26. We do not agree. The phrase "liquid crystal"

8   without being preceded by "a" is broad enough to refer to a single liquid

9   crystal material or to a plurality of liquid crystal materials. Moreover, even

10  assuming for the sake of argument that "liquid crystal" should be construed

11  to mean "*a* liquid crystal," that phrase would read on a mixture of liquid

12  crystal materials because "a" in a claim is customarily construed to mean

13  "one or more." *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1357,

14  55 USPQ2d 1835, 1839 (Fed. Cir. 2000

15       Appellant also argues that the presumption has been rebutted because

16  in contrast to open-ended method or apparatus claims, which are

17  characterized by having the term "comprises" followed by a list of steps or

18  elements joined by the connective "and," the term "comprises" in Claim 11

19  is followed by a plurality of elements connected by repeated occurrences of

20  the disjunctive "or," a format Appellant contends conveys the meaning of

21  "exclusive of others." Br. 26. We do not agree. Rather than implying

22  exclusivity, the multiple uses of "or" would have been understood as simply

23  making it clear to the reader before reaching the end of the claim that the

24  liquid crystal materials are being recited in the alternative. Appellant's

25  related contention that in order to be open-ended, the claim would have to

26  use syntax such as "said liquid crystals comprise K18 and K24" (Br. 27) is

39

ISSI 00178

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   incorrect. Such a claim would be limited to a liquid crystal mixture

2   containing both K18 and K24.

3         While Appellant is correct to note (Br. 31-32) that the "Detailed

4   Description of the Invention" discusses the use of a single liquid crystal

5   material, namely, K-18, and does not mention using mixtures of liquid

6   crystal materials, those facts do not provide a sufficient basis for restricting

7   the claim to the use of one liquid crystal material at a time. As already

8   noted, it is improper to read limitations from examples given in the

9   specification into the claims, *Constant*, 848 F.2d at 1571, 7 USPQ2d at

10  1064, or to construe a claim as limited to a preferred or sole embodiment.

11  *Conoco*, 460 F.3d at 1357-58, 79 USPQ2d at 1807.

12        Finally, Appellant's reliance (Br. 25-30) on a number of district court

13  decisions[31] is misplaced because those decisions are not binding precedent as

14  to this Board. *See* SOP2.

15  D.  Conclusion

16        Claim 11 does not preclude the use of a mixture of liquid crystal

17  materials.

18  *ISSUE 5 -- DOES ASZODI SATISFY EVERY LIMITATION OF CLAIM 11?*

19  A.  Facts

20        1. Aszodi (Br. Ex. C; Reexam. Ex. 5) describes the use of nematic

21  liquid crystal materials to generate thermal maps of microcircuits and more

22  particularly the use of mixtures of two nematic liquid crystal materials for

---

[31] *Tulip Computers Internationali B.V. v. Dell Computer Corp.*,
236 F.Supp.2d 364 (D. Del. 2002) (Br. 28-29); *Bristol-Myers Squibb Co. v.
Immunex Corp.*, 86 F.Supp.2d 447 (D.N.J. 2000) (Br. 25); *Novo Nordisk
A/S v. Eli Lilly and Co.*, No. 98-643 MMS, 1999 WL 1094213, at *12-13
(D. Del. Nov. 18, 1999) (Br. 29).

40

ISSI 00179

Appeal 2006-3235
Reexamination Control No. 90/006,696

1   that purpose. Aszodi at 1127, Abstract. One of these materials is 8CB

2   (a.k.a. K24), one of the liquid crystal materials recited in Claim 11; the other

3   is 8OCB (a.k.a. M24), which is not recited in the claim.

4       2. Figure 1, *id.* at 1128, is a graph showing that the clearing point

5   (i.e., nematic-isotropic transition) temperature of the mixture is a linear

6   function of the proportions of M24 (80CB) and K24 (8CB). The left end

7   point of the graph represents 100 mole percent of 8OCB (M24) and shows a

8   transition temperature of about 80 °C. The right end point represents 100

9   mole percent of 8CB (K24) and shows a transition temperature of about

10  40 °C. Thus, neither end point represents a mixture.

11      3. The caption under Figure 1 explains that the small circle on the

12  line representing the nematic-isotropic transition temperature corresponds to

13  a specific example of a mixture containing 60 mole percent 8CB (i.e., K24)

14  and 40 mole percent of 8OCB (i.e., M24). *Id.*

15      4. Figure 2 (at 1128) demonstrates that the liquid crystal material

16  appears to be dark when it is in the isotropic phase (i.e., its temperature is at

17  or exceeds the nematic-isotropic transition temperature).

18      5. Aszodi describes an experiment in which the M24/K24 mixture is

19  used for thermal mapping of "a chip . . . from a commonly manufactured

20  LED with an octagonal active area." *See* sentence bridging pages 1128 and

21  1131 (page 1129 consists of Figure 5; page 1130 is blank). Figure 4 (*id.*

22  at 1131) illustrates the structure of the LED. Aszodi does not characterize

23  this LED as being a failed or defective device.

24      6. Figure 5 (at 1129), which is nearly illegible in the photocopy of

25  record, depicts a photomicrograph obtained during the experiment. The

26  caption under this figure reads:

41

ISSI 00180

Appeal 2006-3235
Reexamination Control No. 90/006,696

1      Fig. 5. Original photomicrograph of part of a LED with
2      octagonal dissipation area. The isotherm corresponding to 31.9
3      K [sic, °C] is the boundary of the nematic-isotropic regions.
4      Using a polarized incident light beam the isotropic region is the
5      dark one. The evaporated Au-contacts can also be seen. Due to
6      the higher current density (dissipation) near the contacts, the
7      surface is at a higher temperature there.

8    Aszodi at 1129. Regarding this figure, Aszodi further explains: "The

9    'heating map' of the chip with a given electrical driving power as a

10    parameter is illustrated in Fig. 5; this is a photomicrograph of an LED with a

11    well-observable phase transition trajectory. For the sake of clarity only one

12    isotherm is given." *Id.* at 1131, 1st col., 1st full para.

13        7. The caption for Figure 6 explains that Figure 6(a) is a temperature

14    map of the same part of the LED that is depicted in Figure 5 and was

15    constructed from eleven photographs. *Id.* at 1311.

16        8. Figure 6(b) shows the chip surface divided into temperature

17    regions labeled $T_1$-$T_6$, of which $T_6$ is the smallest and hottest (i.e., 38 °C).

18        9. The caption for Figure 6 describes Figure 6(b) as "a computer

19    simulation for the thermal map of LED. . . . Dissipated power was 1 W."

20    Regarding Figure 6(b), Aszodi further explains:

21      To simulate the thermal properties of the LED in question (i.e.
22      the isotherms corresponding to a given input power) we applied
23      the computer program THERMANAL [endnote number
24      omitted]. In Fig. 6(b) the shape of the thermal map and the
25      relative differences in temperature between isotherms
26      correspond to a dissipated power of 1W.

27    *Id.* at 1131, 1st col., 1st full para.

28    B. <u>Principles of law</u>

29        Anticipation is a question of fact. *Med. Instrumentation &*

30    *Diagnostics Corp. v. Elekta AB,* 344 F.3d 1205, 1220, 68 USPQ2d 1263,

42

ISSI 00181

Appeal 2006-3235
Reexamination Control No. 90/006,696

1  1275 (Fed. Cir. 2003). A claim is anticipated if each and every limitation of

2  the claim is found in a single prior art reference. *Atofina v. Great Lakes*

3  *Chem. Corp.*, 441 F.3d 991, 999, 78 USPQ2d 1417, 1423 (Fed. Cir. 2006).

4  　　　　Although the examiner previously asserted anticipation by the 100%

5  K24 formulation that is one of the end points of Aszodi's Figure 1 graph,

6  Final Action 6, the Examiner has abandoned that position because "*Aszodi*

7  discloses a mixture of K-24 and M-24, and does not disclose using 100% K-

8  24 with sufficient specificity (as argued by the patentee on p. 50 [of the

9  Brief], and the examiner agrees)." Answer 15, last four lines. Page 50 of the

10  Brief cites "Manual of Patent Examining Procedures § 2131.0" [sic], which

11  we assume was intended to be a reference to § 2131.03 because that section

12  quotes *Atofina's* holding that "the disclosure of a range is no more a

13  disclosure of the end points of the range than it is of each of the intermediate

14  points." *Atofina*, 441 F.3d at 1000, 78 USPQ2d at 1424.

15  　　　　Finally, we note that "[t]he discovery of a new property or use of a

16  previously known composition, even when that property and use are

17  unobvious from prior art, can not impart patentability to claims to the known

18  composition." *In re Schreiber*, 128 F.3d 1473, 1477, 44 USPQ2d 1429,

19  1431 (Fed. Cir. 1997) (quoting *In re Spada*, 911 F.2d 705, 708, 15 USPQ2d

20  1655, 1657 (Fed. Cir. 1990)).

21  C. <u>Analysis</u>

22  　　　　For purposes of this analysis, we will focus on whether Claim 11 is

23  anticipated by Aszodi's specific example of a 40/60 M24/K24 mixture.

24  　　　　Comparing Claim 11 to Aszodi, we agree with the Examiner

25  (Answer 10) that the dark regions in the single microphotograph depicted in

26  Figure 5 are the result of detecting hot spots in the LED chip and that Aszodi

43

ISSI 00182

Appeal 2006-3235
Reexamination Control No. 90/006,696

1  therefore satisfies the preambular language, "A . . . use of liquid crystal for

2  detecting hot spot on die or wafer with a hot spot detection method." As

3  explained above, none of the claim language requires that the hot spot

4  detection method be performed on a failed or defective device or precludes

5  the location of the detected hot spot from being known prior to performance

6  of the hot spot detection method.  The body of the claim is satisfied because

7  Aszodi's method employs K24, one of the claimed liquid crystal materials,

8  in a mixture also containing M24 and the claim does not preclude a mixture

9  of liquid crystal materials.  Based on the same reasoning, the claim is also

10  anticipated by the process of obtaining each of the eleven microphotographs

11  used to create the temperature map depicted in Figure 6(a).

12       In view of the above, it is not necessary for us to consider the

13  Examiner's alternative reliance on region $T_6$ in the temperature map

14  depicted in Figure 6(b).

15       In addition to the arguments already addressed above, Appellant

16  attempts to distinguish Claim 11 from Aszodi for reasons that have no basis

17  whatsoever in the claim language.  One such reason is that "Aszodi's

18  thermal mapping method is done with respect to a known 'temperature

19  range.' (Refer to Fig. 6(a), page 1131, Col. 1, paragraph 2)[.]  As against

20  this, in claim 11, there is no such 'temperature range.'"  Brief 39, para. 4.

21  Nothing in the claim precludes the detection of hot spots with respect to a

22  known "temperature range."

23       Another argument having no basis in the claim language is the

24  assertion that the phase transition sharpness of K24, recited in the claim, is

25  almost 200 times greater than the phase transition sharpness of Aszodi's the

26  M24/K24 mixture.  Br. 39, para. 7.  Specifically, Appellant characterizes

44

ISSI 00183

Appeal 2006-3235
Reexamination Control No. 90/006,696

1  Aszodi's Figure 3 as showing an approximate sharpness of 0.2 °C and

2  contrasts that with the 0.001 °C figure attributed to K18 at column 3, lines

3  61-66 of the '857 patent:

4         One of the nematic liquid crystals used for this
5         invention is 4 cyano-4'hexyl-biphenyl. It is sold by E.M.
6         Chemical under the trade name of K-18 nematic liquid
7         crystal. I found it has 4 phase transition temperatures;
8         the temperature band width of each phase transition is
9         estimated to be on the order of 0.001 degree Celsius.

10  Br. 39, para. 7. However, the claim places no restriction on the degree of

11  sharpness of the phase transition. Nor is it material to the rejection that

12  Aszodi fails to discuss the detectable power level of the hot spot, Br. 39,

13  para. 8, since the claim does not address power levels. Furthermore, even if

14  the results achieved by Appellant's invention are unexpectedly superior in

15  the forgoing respects to those obtained by Aszodi, unexpected results cannot

16  be relied on to overcome a rejection for anticipation. *Schreiber*, 128 F.3d at

17  1477, 44 USPQ2d at 1431; *Spada*, 911 F.2d at 708, 15 USPQ2d at 1657.

18         Nor does the claim preclude knowledge of the heater temperature,

19  ambient temperature, and phase transition temperature, as is allegedly

20  required by Aszodi. Br. 40, paras. 9-11.

21  D. Conclusion

22         The Examiner has established that Aszodi satisfies every limitation of

23  Claim 11. Accordingly, the rejection of Claim 11 under 35 U.S.C. § 102(b)

24  for anticipation by Aszodi is affirmed.

25         No time period for taking any subsequent action in connection with

26  this appeal may be extended. *See* 37 C.F.R. § 1.136(a)(1)(iv)(2006).

27                              AFFIRMED
28

45

ISSI 00184

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    LEE, *Administrative Patent Judge,* concurring.
2
3         Claim 11 begins with language introducing a "new use of liquid
4    crystal" and further expressing that the new use is "for detecting hot spot on
5    die or wafer with a hot spot detection method." The referenced "hot spot
6    detection method" is not the claimed invention, but a redundant recitation of
7    the intended use. No step of any method has been set forth in the claim.
8    While Claims 1-10 are drawn to a method invention, Claim 11 is not. What
9    we have in Claim 11 are just the intended use of a specified material and the
10   material itself. Because the intended use of a material is not itself a
11   recognized class of statutory subject matter for patenting, I would construe
12   Claim 11 as a claim drawn to the material, accompanied by a recitation of
13   the material's intended use. The law is clear that intended use is of no
14   patentable weight and cannot distinguish the recited material or composition
15   from the same composition or material in the prior art. *E.g., In re Schreiber,*
16   128 F.3d 1473, 1477, 44 USPQ2d 1429, 1431 (Fed. Cir. 1997). The patent
17   owner acknowledges on page 50 of the appeal brief that K-24 nematic liquid
18   crystal, octylcyanobiphenyl, was a known and preexisting material.
19   Accordingly, whether or not Aszodi discloses "hot spot detection" is
20   irrelevant. Aszodi refers to K-24 nematic liquid crystal, octylcyanobiphenyl,
21   which the patent owner acknowledges as old. I would affirm the rejection of
22   Claim 11 for anticipation on that basis alone.
23
24
25
26

46

ISSI 00185

Appeal 2006-3235
Reexamination Control No. 90/006,696

1    cc:
2
3    <u>Mailing address for Appellant</u>
4
5    DERGOSITS & NOAH LLP
6    Four Embarcadero Center, Suite 1450
7    San Francisco, CA  94111
8
9
10   <u>Mailing address for Third-Party Requester</u>
11
12   Robert A. Westerlund
13   WESTERLUND-POWELL, P.C.
14   100 Daingerfield Road, Suite 100
15   Alexandria, VA  22314-2886

47

ISSI 00186